IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

SHEILA SUMMERLIN SHAW, *et al.*,     :
:
           **Plaintiff,**     :
:
**v.**     :     **CASE NO:  7:22-cv-66 (WLS)**
:
**TERRY GRIFFIN**, *et al.*,     :
:
           **Defendants.**     :
_____     :

# ORDER

This case arises from Defendants', law enforcement officers, entry into Plaintiffs' home without a warrant or consent which resulted in Plaintiffs' filing federal and state law claims against Defendants. Defendants filed a Motion for Summary Judgment (Doc. 39) ("Motion") asserting they had probable cause and exigent circumstances justifying their entry into Plaintiffs' home; and thus, Defendants are entitled to qualified immunity and official immunity.[1] Plaintiffs filed a brief in opposition (Doc. 45) to which Defendants replied (Doc. 57).

After review and as more fully discussed below, the Motion is **GRANTED IN PART**[2] and **DENIED IN PART**.

## I.    PROCEDURAL BACKGROUND

On July 5, 2022, Plaintiffs Hoyt Summerlin ("Summerlin") and his sister, Sheila Summerlin Shaw ("Shaw") filed a Complaint for Damages (Doc. 1) ("Complaint') against Sgt.

---

[1] In *Gray v. Ector*, 541 F. App'x 920, 924 n.5 (11th Cir. 2013), the Eleventh Circuit noted that "[u]nder Georgia law, 'official immunity' and 'qualified immunity' are used interchangeably." The Parties here use both terms. Consistent with the Eleventh Circuit's use of the terms and in the interest of clarity, the Court uses the phrase "official immunity" when discussing state law claims so as to distinguish it from the term "qualified immunity" that is used in the context of federal § 1983 claims. *Id.*

[2] Plaintiffs advised the Court that they do not object to dismissal of two of their claims: Count 3–False Imprisonment in violation of O.C.G.A. § 51-7-20 against all Defendants, and Count 5–Trespass in violation of O.C.G.A. § 51-9-1 against all Defendants. (*See* Doc. 45 at 1 n.1). Thus, those claims are dismissed with prejudice, without further discussion.

Terry Griffin ("Sgt. Griffin"), Deputy Jared Crosby ("Deputy Crosby"), and Deputy Anthony Branham ("Deputy Branham," and together with Sgt. Griffin and Deputy Crosby, the "Defendants"). The incident on which Plaintiffs' claims are based occurred on April 13, 2021, while all Defendants were employed as law enforcement officers at the Brooks County Sheriff's Office ("BCSO"). (*Id.* ¶¶ 4–6). Plaintiffs assert the following five claims against Defendants in their individual capacities:

> Count 1: § 1983 Claim for Unreasonable Search and Seizure in violation of the Fourth Amendment against all Defendants;
>
> Count 2: § 1983 Claim for Unreasonable and Excessive Force in violation of the Fourth Amendment against Sgt. Griffin;
>
> Count 4: Battery in violation of O.C.G.A. § 51-1-13 against Sgt. Griffin;
>
> Count 6: Punitive Damages under O.C.G.A. § 51-12-5.1 against all Defendants; and
>
> Count 7: Attorney Fees under O.C.G.A. § 13-6-11 against all Defendants.

On August 11, 2022, Defendants filed a timely Answer (Doc. 8) to the Complaint raising numerous affirmative defenses, denying they violated Plaintiffs' rights under any provisions of, or amendments to, the United States Constitution, any other United States laws, any provisions of, or amendments to, the Georgia Constitution, or any other Georgia laws. As noted, Defendants assert they are entitled to qualified immunity and to official immunity.

After resolution of discovery disputes, including a motion to compel, and extension of discovery deadlines, Defendants' Motion was filed on April 16, 2024. Plaintiffs were granted an extension of time to respond and thereafter timely responded to the Motion on May 28, 2024. (Doc. 45). Defendants were also granted an extension of time to reply and thereafter timely filed their reply on June 28, 2024. (Doc. 57). As the movants for summary judgment, Defendants complied with this Court's Local Rules by attaching a separate and concise statement of undisputed material facts (Doc. 39-2), to their Motion. *See* M.D. Ga. L.R. 56. Also in compliance with Local Rule 56, Plaintiffs filed their separate and concise statement of undisputed material facts (Doc. 45-1 at 13–20), and responses to each of Defendants' statements of undisputed material fact (Doc. 45-1 at 1–13). Although not required by the Local Rules, Defendants responded to each of Plaintiffs' statements of undisputed material fact. (*See*

Doc. 57-1). As such, the Court finds that Defendant's Motion for Summary Judgment is ripe for review.

## II. FACTUAL HISTORY

### A. Introduction

The following facts are derived from the (1) Complaint, (2) Defendants' statement of undisputed material facts for which there is no genuine issue of fact to be tried as reflected by Plaintiffs' responses thereto, and (3) Plaintiffs' statement of undisputed material facts for which there is no genuine issue of fact to be tried as reflected by Defendants' responses thereto.[3] Where relevant, the factual summary also contains undisputed and disputed facts derived from the Record in this case including the pleadings, the discovery materials on file, and any affidavits or depositions submitted, all of which are construed in a light most favorable to Plaintiffs as the nonmoving parties. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. Relevant Facts

In January 2020, Summerlin had a written agreement with Richard Cook ("Cook") to rent a trailer located at 74 Bay Meadow Drive, Valdosta, Georgia (the "Residence").[4] Summerlin was paying the rent due to Cook under their agreement.[5] Plaintiffs were living at the Residence on April 13, 2021, when Defendants and Captain Jerry Miller ("Capt. Miller") with BCSO's narcotics division, appeared at the Residence to perform a "knock-and-talk."[6] The "knock-and-talk" was precipitated by the following information and comments the Defendants received from three individuals regarding alleged activities at the Residence.

---

[3] References to Doc. 45-1 are to statements contained in Defendants' statement of undisputed material facts to which Plaintiffs specifically state they have no dispute. (*See* Doc. 45-1 at 1–13). References to Doc. 57-1 are to statements contained in Plaintiffs' statement of undisputed material facts which Defendants specifically concede the Court may properly consider for purposes of their Motion.

[4] Doc. 57-1 ¶ 1; *see also* Hoyt Summerlin Dep. 14:2–4, July 25, 2023, ECF No. 23-4 [hereinafter "Summerlin Dep. ___"].

[5] Summerlin Dep. 123:22–25.

[6] Doc. 45-1 ¶¶ 1, 11. A "knock-and-talk" encounter is a voluntary interaction between a citizen and an investigating officer. *Moore v. Pederson*, 806 F.3d 1036, 1045 n.11 (11th Cir. 2015). *See* discussion *infra* Part IV.B.1.b.

First, approximately three months prior to April 13, 2021, an unknown woman ("Witness 1") approached Sgt. Griffin at a gas station and informed him: "You need to watch the house on Bay Meadow Drive. It's the last house on the right, being a trailer. There's a lot of traffic going and coming from that location staying only a few minutes at all times of the day and night."[7] The conversation with Witness 1 lasted approximately two minutes, and within a few days after receiving this information, all three Defendants performed a drive-by surveillance of the Residence.[8] Defendants' only observations from the drive-by were that the home was a single-wide trailer, there was a shed in the back, a blue SUV was in the yard, the yard was not well-kept, and there were no cameras.[9] Sgt. Griffin made only mental notes of the conversation with Witness 1 and the drive-by.[10]

Second, on April 12, 2021, Sgt. Griffin called Cook, an inmate at the Lowndes County Jail and the person from whom Plaintiffs were leasing the Residence.[11] Sgt. Griffin called Cook to answer Cook's question as to why BCSO had a "hold" on Cook preventing his release from the Lowndes County Jail.[12] This conversation took place on a speaker phone and Deputies Crosby and Branham were also present.[13] BCSO's hold related to an incident that occurred in October 2019, when Lowndes County officers requested BCSO's assistance in executing an arrest warrant for Cook who was then living at the Residence.[14] During a search of the Residence at the time of Cook's arrest, Lowndes County officers found drugs, and because the Residence was in Brooks County, Georgia, BCSO's assistance was requested.[15] Lowndes County took custody of Cook pursuant to a warrant, and BCSO took the drugs into evidence

---

[7] Sgt. Griffin Dep. 25:2–19, July 26, 2023, ECF No. 54 [hereinafter "Griffin 2023 Dep. ___"]; *see also* Sgt. Griffin Dep. 32:23–33:2, Mar. 13, 2024, ECF No. 51 [hereinafter "Griffin 2024 Dep. ___"].

[8] Griffin 2023 Dep. 26:18–20; 28:15–23.

[9] *Id.* 29:23–30:18.

[10] *Id.* 30:23–31:6.

[11] Griffin 2024 Dep. 29:23−30:18; *see also* Griffin 2024 Dep., Ex. 4 at 3, ECF No. 51-1 (Apr. 13, 2021 Misc. Incident Rept.).

[12] Griffin 2024 Dep. 29:23−30:18; *see also* Deputy Crosby Dep. 40–41, July 26, 2023, ECF No. 53 [hereinafter "Crosby Dep. ___"].

[13] Crosby Dep. 43:8–11.

[14] Griffin 2024 Dep. 34:4–36:4.

[15] *See* Deputy Branham Dep. 21:8–19 July 26, 2023, ECF No. 52 [hereinafter "Branham Dep. ___"];

and took out warrants on Cook which was the reason for BCSO's hold on Cook.[16] Deputies Branham and Crosby assisted in Cook's arrest in October 2019, and Sgt. Griffin may have assisted in the arrest or related BCSO warrants for Cook.[17] There is no evidence in the Record indicating that either Plaintiff was living at the Residence when Cook was arrested, and as noted above, Plaintiffs began leasing the Residence in January 2020.

During this April 12, 2021 phone conversation, Cook told Defendants that a person named Hoyt Steven or Steven Hoyt was staying at the Residence without Cook's permission, and this individual was cooking and selling methamphetamine from the Residence.[18] When Defendants conducted the knock-and-talk at Plaintiffs' Residence the next day, Defendants were clearly aware that Cook is a criminal who has served decades behind bars.[19] It is also worth noting again that Cook was arrested in October 2019. Therefore, when Cook made the statements on which the Defendants relied, he had been in jail for approximately a year and a half. The Record contains neither details nor information as to the basis of Cook's statements. Further, there is no Record evidence establishing Cook's reliability.

Defendants verified that Cook and his father owned the Residence,[20] but they were unable to locate information on Hoyt Steven or Steven Hoyt.[21] When asked about anything else Defendants did to verify Cook's statements, Deputy Crosby testified:

> A. Well, I mean, as far as I was to know, there wasn't anything else to dig up on Mr. Cook. I mean, we already knew who he was, we already knew something about his criminal history, why we had warrants on him, why Lowndes County had warrants on him. We knew that that was his house.
>
> Q. I mean, had you ever used Mr. Cook as an informant or a tipster or anything like that before?
>
> A. No, sir.[22]

---

[16] Griffin 2024 Dep. 30:9–31:3;

[17] *See generally* Branham Dep. 21–23; Crosby Dep. 38–40; Capt. Miller Dep. 15:11–16:1 Mar. 13, 2024, ECF No. 49 [hereinafter "Miller Dep. ___"]; *see also* Griffin 2024 Dep. 34:4–36:4 (Sgt. Griffin was eventually on the scene and either he or Deputy Crosby prepared BCSO's warrant for Cook).

[18] Doc. 45-1 ¶¶ 6–10 (citing Branham Dep. 16:7–15, 18:25–19:8); *see also generally* Crosby Dep. 42–44.

[19] Doc. 57-1 ¶ 2.

[20] Doc 45-1 ¶ 10.

[21] Crosby Dep. 45:20–22.

[22] *Id.* 46:25–47:11.

In response to the same question, Capt. Miller testified:

> Well, my guys and – I tend not to, you know, take sometimes complaints on face value. You know, that's – a lot of times, that's why we resort to a knock and talk, an investigative knock and talk, to either verify or dismiss a complaint that somebody may make about an individual. We did make sure that Mr. Cook owned the residence.
>
> We did have information in the past that there may be drug activity going on at that residence. *And based on those two things, we felt like there was not enough information for a search warrant*, but not by any means that the only thing *that we felt we had enough information was to do an investigative knock and talk and to speak to the individual about these allegations that were being brought against them*.[23]

As to Defendants' third source of information, after talking to Cook, Sgt. Griffin made a phone call to an unidentified witness ("Witness 2") who Sgt. Griffin knew was familiar with the area where the Residence is located. Witness 2 told Sgt. Griffin "that there was a lot of traffic in and out [of the Residence] all times of the night, staying just minutes and leaving; all times of the – mostly during the evening, but some daytime traffic, too."[24]

The Defendants and Capt. Miller decided to do a "knock-and-talk" at the Residence because "[they] didn't have enough for a search warrant[.]"[25] The purpose of the "knock-and-talk" was to investigate potential squatting and narcotics manufacturing and/or trafficking allegedly going on at the Residence.[26] It is unclear how many vehicles the four officers drove to the Residence on April 13, 2021, but only one was a marked patrol vehicle with "Sheriff's Office" on the side on the doors and on the back, but without lights on the top.[27] The vehicles were not parked directly in front of the Residence, but were "parked somewhere close as to not give anyone who was possibly watching outside the residence knowledge that we had pulled up prior to knocking on the door."[28] Deputy Branham went to the backyard of the Residence in case anyone attempted to flee or drop something out back.[29] Deputy Crosby,

---

[23] Miller Dep. 19:4–18 (emphasis added); *see also* Branham Dep. 26:3–15 (Defendants did not apply for a search warrant because they all knew they did not have enough to obtain a search warrant).

[24] Griffin 2023 Dep. 31:7−15.

[25] Griffin 2024 Dep. 53:8−9.

[26] Doc. 45-1 ¶ 13; *see also* Branham Dep. 24:22–26:2.

[27] Doc. 45-1 ¶ 12.

[28] Crosby Dep. 47:22–25.

[29] Doc. 57-1 ¶ 9; *see also* Branham Dep. 31:22–32:10.

Sgt. Griffin, and Capt. Miller went to the front door of the Residence.[30] All four officers were wearing bullet-proof vests with "Sheriff's Office" on the front and back,[31] but Sgt. Griffin and Deputy Branham had a shirt or jacket on over their vest.[32] No one identified themselves as being law enforcement or from the sheriff's office.[33]

When the Defendants and Capt. Miller arrived, Summerlin was asleep and Shaw was dozing off in her bedroom.[34] Sgt. Griffin knocked on the front door, which opens outward, and a man later identified as Plaintiff Hoyt Summerlin opened the door wide enough for Deputy Crosby to see Summerlin's entire body.[35] Summerlin was wearing boxer underwear and no shirt.[36] Summerlin did not recognize any of the Defendants when he opened the door and stated something to the effect that "you're not Kenny."[37] When one of the Defendants tried to snatch the door out of Summerlin's hands, Summerlin quickly shut the door, securing it with a homemade rope lock to keep the door from being reopened from the outside.[38]

Even though Summerlin opened the door far enough for Deputy Crosby to see Summerlin's entire body, there is no evidence in the Record that any of the Defendants observed any weapons, drugs, or other illegal activity prior to Summerlin closing the door. However, Sgt. Griffin immediately began trying to reopen the door, shouting "sheriff's office" and ordering Summerlin to reopen the door.[39] Defendants contend they heard Summerlin running away from the door after he slammed it closed.[40] Plaintiffs dispute that Summerlin ran away from the door because Summerlin is a disabled veteran who cannot run due to

---

[30] Doc. 45-1 ¶¶ 14–15.

[31] *See generally* Miller Dep. 24–25.

[32] *See generally* Branham Dep. 34–35, 58–60.

[33] Doc. 57-1 ¶ 10; *see also* Griffin 2024 Dep. 63:11–14; 64:4–8.

[34] Doc. 57-1 ¶ 7.

[35] Doc. 45-1 ¶ 16.

[36] Griffin 2024 Dep. 94:18–25.

[37] Doc. 57-1 ¶ 12; Doc. 45-1 ¶ 17.

[38] Doc. 45-1 ¶¶ 17–18; Doc. 57-1 ¶ 11.

[39] Doc. 57-1 ¶ 13.

[40] Crosby Dep. 50:16–19.

injuries he has incurred, including a partial femur replacement, an artificial hip, broken back, fractured neck, and pinned right shoulder.[41]

After closing the front door, Summerlin went to Shaw's bedroom to get clothes out of the hamper. After putting on shorts, using the bathroom, flushing the toilet, and retrieving a baseball bat from the kitchen, Summerlin returned to the front door.[42] Summerlin intended to use the baseball bat to protect himself and Shaw from anyone "coming to get" Summerlin.[43]

In the meantime, outside, Sgt. Griffin and Deputy Crosby ran to a window which looked into Shaw's bedroom. From the window, they could see Shaw sitting on the bed.[44] The first thing she heard was banging on her bedroom window, and the first thing she saw was a man with long gray or blond hair, later identified as Sgt. Griffin, banging on her window with the butt of a gun.[45] Sgt. Griffin pointed his gun at Shaw's window and someone yelled "bitch," "open the damn door."[46] From Shaw's window, Sgt. Griffin and Deputy Crosby could also see a bathroom, and they allegedly observed Summerlin "run" through Shaw's bedroom and into the bathroom with something in his left hand.[47]

Sgt. Griffin then left Shaw's bedroom window, found a shovel, and tried to pry the front door open with the shovel.[48] He took this action because to him, "there was extra [sic] circumstances to believe that [Summerlin] was either getting rid of evidence or he was getting a gun or a weapon of some kind. . . . By the mere presence of [Summerlin] seeing me, realizing I was the police, slamming the door the way he did and then running to the back."[49] At the

---

[41] Summerlin Dep. 24:10–25:8; 27:24–29:9.

[42] Doc. 57-1 ¶¶ 16, 22; Doc. 45-1 ¶ 27.

[43] Doc. 45-1 ¶ 27. There is no evidence in the Record that any of the Defendants saw the baseball bat at any time during the April 13, 2021 incident. Nor is a bat mentioned in the incident report. *See* Griffin 2024 Dep., Ex. 4.

[44] Doc. 57-1 ¶ 19.

[45] Shelia Shaw Dep. 24:23–25:25, 62:16–21, July 25, 2023, ECF No. 50 [hereinafter "Shaw Dep. ___"]; *see also* Doc. 57-1 ¶ 18.

[46] Doc. 57-1 ¶¶ 20–21; *see also* Shaw Dep. 26:5–21 (stating that a man at the window was yelling at Shaw to go to the living room, open the front door and "[u]nlock the door now").

[47] Crosby Dep. 55:19–60:6; Griffin 2024 Dep. 55:20–56:5; 61:4–7.

[48] Doc. 57-1 ¶ 17.

[49] Griffin 2024 Dep. 62:22–63:5.

time this incident occurred, Sgt. Griffin had never met either Plaintiff. Nor did he know Summerlin was a felon.[50]

While Sgt. Griffin was trying to reopen the door with the shovel, Summerlin came back and reopened the front door.[51] Deputy Crosby grabbed the door to make sure Summerlin could not shut it again. Summerlin did not step outside. Nor did he invite the Defendants or Capt. Miller into his home.[52] Deputy Crosby and Sgt. Griffin "bum-rushed" Summerlin to gain entry into the Residence.[53] Summerlin's feet came off the ground and his head was slammed into the coffee table.[54] The officers drew their guns, and Sgt. Griffin pointed a gun to the back of Summerlin's neck and to his head while his head was on the coffee table. The gun was pointed at Summerlin for one to two minutes.[55] Summerlin was placed in handcuffs.[56] The testimony varies as to whether Summerlin was then on his knees or whether he was allowed to sit on the sofa after being handcuffed, and when the handcuffs were removed from Summerlin.

The testimony also varies as to what actions were taken by the officers after they entered the Residence, and in particular those taken by Sgt. Griffin. According to the Defendants, upon entry Deputy Crosby handled Summerlin, ordering him to go down to his knees.[57] Sgt. Griffin never touched Summerlin.[58] Instead, Sgt. Griffin went left toward Shaw's bedroom to clear the premises and then escorted Shaw out to the living room.[59] After handcuffing Summerlin, Deputy Crosby cleared the right-hand side of the Residence while Capt. Miller remained in the living room with Summerlin.[60] Deputy Crosby denies that he

---

[50] *Id.* 67:12–23.

[51] Doc. 45-1 ¶ 28.

[52] Doc. 57-1 ¶ 23.

[53] *Id.* ¶ 25.

[54] *Id.*

[55] *Id.* ¶¶ 24–25, 29.

[56] *Id.* ¶ 29.

[57] Griffin 2024 Dep. 73:24–74:3.

[58] *Id.* 74:7–9.

[59] *Id.* 74:18–75:14.

[60] *See generally* Crosby Dep. 61–65.

looked for narcotics while clearing the Residence.[61] The Plaintiffs dispute the contention that Defendants merely cleared the Residence, and assert instead that Defendants conducted an illegal search under the guise of clearing the Residence.

Also contrary to Defendants' testimony, Shaw testified that when she arrived in the living room, she "saw Hoyt's head laying on the coffee table and the gun to the back of his head. He was laying on the coffee table and it – I'd never seen anything like that, so I just sat down, you know."[62] Shaw identified Sgt. Griffin as the officer holding the gun to Summerlin's head.[63] Shaw told Defendants that she needed to urinate, to which Sgt. Griffin responded: "Go ahead and piss on yourself, bitch."[64] Sgt. Griffin was still holding the gun to Summerlin's head when he responded to Shaw's statement.[65] Shaw urinated on the sofa.[66] Shaw was not handcuffed at any point during the incident. Nor did anyone point a gun directly at Shaw during the incident.[67]

At some point, Defendants explained that they came to the Residence because Cook told them the people living there did not have permission to be there and they were cooking and selling methamphetamine. Summerlin told Defendants he had receipts for rental payments and pointed to a drawer in a sofa table. Defendants found the rent receipts in the drawer, which appeared to show payments made from Summerlin to Cook's brother. Defendants further confirmed that Plaintiffs were living at the Residence lawfully by calling Cook's brother and confirming what Plaintiffs told them.[68] After Defendants retrieved and reviewed the receipts, Deputy Crosby removed Summerlin's handcuffs. Deputy Crosby recalls

---

[61] *Id.* 63:25–64:5.

[62] Shaw Dep. 30:2–6.

[63] *Id.* 41:5–9. Regardless of Defendants' assertions that Sgt. Griffin never touched Summerlin and their inference that he left Deputy Crosby to take care of Summerlin, Defendants concede that for summary judgment purposes, the Court can consider the evidence that "Sgt. Griffin kept the gun pointed at Summerlin for 1 to 2 minutes," (Doc. 57-1 ¶ 29), and that Sgt. Griffin and Deputy Crosby "bum-rushed" Summerlin to gain entry into the Residence (*Id.* ¶ 25).

[64] Doc. 57-1 ¶¶ 31–32; *see also* Shaw Dep. 36:25-38:10.

[65] Shaw Dep. 41:22–25.

[66] Doc. 57-1 ¶ 32.

[67] Doc. 45-1 ¶ 35.

[68] *Id.* ¶¶ 38–39; *see also generally* Branham Dep. 47−49.

approximately fifteen minutes passing between the time of entry into the Residence and when he removed the handcuffs from Summerlin.[69]

No evidence of methamphetamine or other drugs was found at the Residence.[70] Shaw did not hear any of the Defendants say they were with the sheriff's office and did not see their badges.[71] She did not know the Defendants were law enforcement officers until they were ready to leave the Residence.[72] Summerlin also testified that he did not realize the Defendants were from the sheriff's office when he opened the door, but when one of them tried to grab the door out of his hand, he shut and locked the door.[73] The testimony varies from thirty minutes to an hour as to how long the officers were in the Residence.

## III.   STANDARD OF REVIEW

### A. Motion for Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue

---

[69] Doc. 45-1 ¶ 39.

[70] Doc. 57-1 ¶ 34.

[71] *See generally* Shaw Dep. 42–44.

[72] *Id.*

[73] *See generally* Summerlin Dep. 80–84.

as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.'" *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (per curiam) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The movant can meet that burden by presenting evidence showing there is no dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of an element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings and by [nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at 587−88; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### B. Local Rule 56

Local Rule 56 requires the following:

> The movant for summary judgment under Rule 56 of the Federal Rules of Civil Procedure shall attach to the motion a separate and concise statement of the material facts to which the movant contends there is no genuine dispute to be tried. Each material fact shall be numbered separately and shall be supported by specific citation to particular parts of materials in the record. . . .
>
> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine dispute to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56. As stated above, the Parties complied with the Federal Rules of Civil Procedure and the Local Rules by filing timely a motion for summary judgment, response and reply thereto, and attaching separate and concise statements of material facts and responses thereto. The Court will now address this ripe Motion.

## IV.  LAW AND ANALYSIS

### A.  Plaintiffs' § 1983 Claims

Title 42 U.S.C. § 1983 creates a cause of action which allows an individual whose federal constitutional or statutory rights have been violated to seek damages from the state actor who caused the violation.[74] A plaintiff asserting a § 1983 claim must show that the conduct complained of (1) was committed by a person acting under color of state law, and (2) that conduct deprived a plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156–57 (1978)). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citing *Carey v. Piphus*, 435 U.S. 247, 254–257 (1978)).

---

[74] 42 U.S.C. § 1983, in relevant part, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Plaintiffs assert Defendants violated their Fourth Amendment rights to be free from unreasonable searches and seizures and Summerlin contends that Sgt. Griffin violated his Fourth Amendment right by using excessive force against Summerlin. Defendants, asserting there are no genuine issues of material fact, now argue they had probable cause and exigent circumstances justifying their entry into Plaintiffs' home without a warrant or consent; and therefore, they are entitled to qualified immunity as to Plaintiffs' § 1983 claims.

### B.  Qualified Immunity

> Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." For qualified immunity to apply, a government official must first establish that he was acting within his discretionary authority when the alleged wrongful acts occurred. "Once it has been determined that an official was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity is inappropriate." "First, the plaintiff must show that the official's alleged conduct violated a constitutionally protected right." "Second, the plaintiff must demonstrate that the right was clearly established at the time of the misconduct." "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."

*Garcia v. Casey*, 75 F.4th 1176, 1185 (11th Cir. 2023) (citations omitted).

Plaintiffs do not dispute that the Defendants were acting within their discretionary authority. Thus, the burden shifts to Plaintiffs to present sufficient evidence to show that there is a genuine issue of material fact as to whether Defendants violated Plaintiffs' Fourth Amendment rights and that any such rights were clearly established. The Court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

1.  <u>Plaintiffs offered sufficient evidence to create a genuine issue of material fact as to whether Defendants' actions constituted an unlawful entry, search, and seizure</u>

Plaintiffs allege Defendants unlawfully entered and searched their Residence and unlawfully seized the Plaintiffs in their Residence, and further assert these unlawful actions were done without a warrant, consent, or probable cause and exigent circumstances. Plaintiffs further assert that Defendants failed to immediately cease the search and retreat from the Plaintiffs' home. Defendants contend that they went to the Residence to conduct a "knock-and-talk" investigation to check out allegations that someone was "squatting" at the Residence and cooking and selling methamphetamine. Defendants argue that Summerlin's actions after he opened the front door created exigent circumstances which authorized them to enter the home without a warrant or consent when Summerlin reopened the front door. Plaintiffs contend Defendants exceeded the permissible scope of a "knock-and-talk" encounter, and that Defendants lacked consent or exigent circumstances and probable cause to enter Plaintiffs' home, let alone search the premises or seize Plaintiffs.

The Fourth Amendment of the United States Constitution provides that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." "The 'very core' of the Fourth Amendment is 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Hardigree v. Lofton*, 992 F.3d 1216, 1224 (11th Cir. 2021) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

> Because "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," it is "a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 585–86, 100 S. Ct. 1371, 1379–80, 63 L.Ed.2d 639 (1980) (quotation marks and citations omitted). The presumption is rebutted, and the arrest lawful, only when some exception to the warrant requirement—such as consent or exigent circumstances—exists.

*Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008). Absent consent, Eleventh Circuit precedent requires both probable cause and exigent circumstances prior to officers conducting a warrantless search of a home. *United States v. Franklin*, 694 F.3d 1, 7 (11th Cir. 2012) ("A warrantless search is allowed, however, where both probable cause and exigent circumstances exist." (quoting *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc)). "As

*Payton* makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." *Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1328 (11th Cir. 2006) (quoting *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam)).

The Fourth Amendment is not violated, however, if a person with authority voluntarily consents to a warrantless search. *Bates*, 518 F.3d at 1243. Plaintiffs did not give Defendants consent to enter their home.[75] Rather, Defendants contend that the exigency exception applies here. That is, "a warrant is not required where the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (internal quotation marks omitted). "[T]he Supreme Court has laid down the firm rule that unless exigent circumstances are present, the threshold to the entrance of the home 'may not reasonably be crossed without a warrant.'" *Id.* at 1244–45 (quoting *Payton*, 445 U.S. at 590). This rule is not to protect the suspect, but to protect the sanctity of his home from entry in the absence of a warrant issued on a magistrate's finding of probable cause. *Id.* at 1244. Exigent circumstances include situations such as when officers are in hot pursuit of a suspect, there is a risk of removal or destruction of evidence, or imminent danger to officers or the public. *Id.* at 1246. The Defendants bear the burden of proving that they had probable cause and that there was exigency. *United States v. Walker*, 390 F. App'x 854, 857 (11th Cir. 2010).

      *a. Probable Cause*

Capt. Miller's, Sgt. Griffin's, and Deputy Branham's testimony reflect that based on the information they had from the two Witnesses and Cook, none of the officers believed there was sufficient probable cause to obtain a warrant to search the Residence.[76] In an about-face, Defendants now argue that the information provided by the Witnesses and Cook was sufficient to establish probable cause for a warrant, but that Defendants were under no

---

[75] Griffin 2024 Dep. 87:24–25 ("I would say we went in. He did not invite us in."); *see also* Doc. 57-1 ¶ 23 (showing that when Summerlin reopened the door, he did not step outside, nor did he invite Defendants into his home).

[76] *See* Miller Dep. 19:4–18 (admitting officers only "had enough information . . . to do an investigative knock and talk"); (Griffin 2024 Dep. 53:8–9) ("[they] didn't have enough for a search warrant"); Branham Dep. 26:3–15 (Defendants did not apply for a search warrant because they all knew they did not have enough to obtain a search warrant).

obligation to obtain a warrant before conducting a "knock-and-talk" investigation.[77] This legal statement that a warrant is unnecessary to conduct a "knock-and-talk" investigation, is accurate. *See Kentucky v. King*, 563 U.S. 452, 466-67 (2011). The first issue here is whether Defendants had the probable cause they now assert.

This change of position flies in the face of Defendants' and Capt. Miller's deposition testimony, and in and of itself, could raise a question of material fact sufficient to defeat summary judgment as to Plaintiffs' § 1983 claims. "When the *facts are not in dispute*, whether probable cause existed is a question of law, and summary judgment is appropriate." *Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990) (emphasis added). Here, the facts are not in dispute as to the information provided to Defendants by Witnesses 1 and 2 and Cook. The probable cause analysis rests on the information provided to Defendants by these individuals.

At most, Defendants may have had suspicions that individuals were "squatting" at the Residence and that there was possible drug activity occurring there if their witnesses actually observed what they related and if they were reliable. Such suspicions permitted them to conduct only a "knock-and-talk" investigation. *See Tobin*, 923 F.2d at 1511 ("Reasonable suspicion cannot justify the warrantless search of a house, but it can justify the agents' approaching the house to question the occupants." (citations omitted)). It is difficult to infer dealing and cooking methamphetamine from the statements made, except for Cook's allegation. Not only had he been continually jailed for an extended period of time, but Defendants present no evidence supporting Cook's reliability. Thus, it is a stretch to characterize Defendants' suspicions as reasonable. Based on the totality of the circumstances as presented, Defendants' suspicions did not equate to "probable cause."

> "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from *reasonably trustworthy information*, are sufficient to cause a *person of reasonable caution* to believe that a criminal offense has been or is being committed." It requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity."

*Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (emphasis added) (citations omitted).

If Defendants had sought a search warrant, as they now contend they could have done, they would have been required to establish that the information in the search warrant affidavit

---

[77] *See* Doc. 39-1 at 7 n.1 and accompanying text.

was fresh and that their witnesses were credible and reliable. *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) ("The information in the affidavit must also be fresh[,]" and "[i]f an informant is mentioned in the affidavit, the affidavit must also demonstrate the informant's veracity and basis of knowledge." (internal quotation marks omitted)).

Witness 1's information that there was a lot of traffic in and out of the Residence at all times of the day and night was provided in a two-minute conversation, three months prior to the April 13, 2021 knock-and-talk. Defendants offer no evidence regarding Witness 1's credibility or details supporting her statement. Sgt. Griffin does not state definitively whether Witness 1 personally observed the activity she described or how she obtained the general information she passed on to him. The drive-by conducted by Defendants resulted in neither incriminating evidence being discovered nor observations that may have supported Witness 1's statements other than there was a residence. Not only was Witness 1's information possibly and likely stale, but Sgt. Griffin did not obtain Witness 1's name, address, or phone number. Nor did he retain any written notes of Witness 1's information nor of Defendants' drive-by investigation.[78] Instead he has only his mental notes of the information provided.[79] Thus, Defendants altogether lack any Record information as to Witness 1's veracity or her basis of knowledge.

Information obtained from Cook was neither detailed nor otherwise facially credible. Defendants were well aware of Cook's lengthy criminal history—at least two of them were involved in Cook's immediate prior arrest. Cook had apparently remained in custody during that time because of BCSO's hold. Defendants had never used Cook as an informant. Yet the only verification made by Defendants as to the truthfulness of Cook's information was to confirm that Cook was indeed a co-owner of the Residence. As with Witness 1, the officers do not state that Cook said he personally observed the alleged activity or how he knew of the alleged activity. Most importantly, when he made his statements, Cook was in jail and thus incapable of making personal observations of the Residence. Defendants have failed to address this problem as to Cook's information. Thus, it is reasonable to infer that if any of Cook's information was true, then it could only have come from yet another unidentified

---

[78] Griffin 2023 Dep. 26:13–17.

[79] *Id.* 30:23–31:3.

"witness" on whom the Record is devoid of any information. Cook's statements added nothing credible to Witness 1's information which Defendants admitted they did not believe established probable cause.

Sgt. Griffin contacted Witness 2 because the witness was familiar with the area of town where the Residence is located. However, even though Sgt. Griffin talked to Witness 2 on April 13, 2021, no information is provided as to when Witness 2 had last noticed or seen "a lot of traffic" at or around the Residence or any additional particulars from Witness 2's personal knowledge.

Only Cook, then jailed, made any assertion that methamphetamine was being cooked and sold at the Residence. Defendants earlier acknowledged that they lacked probable cause at the time of the April 13, 2021 incident. Now, in hindsight, perhaps realizing they needed both probable cause and exigent circumstance for their actions, Defendants argue they had probable cause at the time of the April 13, 2021 incident. However, none of the Defendants provide any details from any identified source or combination of sources that require the finding upon undisputed material facts, as a matter of law, that Defendants had probable cause at that time.

Based on the foregoing, the Court finds that Plaintiffs have pointed to Record evidence and the Record shows that genuine issues of material fact exist as to whether Defendants had probable cause. Thus, because both probable cause and exigency are needed, the Court need not reach or consider whether there were exigent circumstances. But upon review, it is clear that a genuine issue of material fact also exists as to whether exigent circumstances were present at the time Defendants entered Plaintiffs' Residence.[80]

       *b.* *"Knock-and-Talk"*

A "knock-and-talk" encounter is a *voluntary* interaction between a citizen and an investigating officer. *Moore v. Pederson*, 806 F.3d 1036, 1045 n.11 (11th Cir. 2015). It is particularly important to recognize the *voluntary* nature of this interaction between citizen and police. A "knock-and-talk" is predicated on the idea that, without a warrant, law enforcement officers may approach a home and request to speak with the occupants just like any citizen

---

[80] Defendants did not assert that they had arguable probable cause. Therefore, the Court does not address it.

might do. Those officers, however, have no more license to enter private property than any other citizen would have. That is "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Fla. v. Jardines*, 569 U.S. 1, 8 (2013). During a "knock-and-talk" encounter, "when a citizen . . . chooses to speak with an officer, that citizen has the right to cease answering questions and walk away from the officer; the encounter is entirely *voluntary*." *Moore*, 806 F.3d at 1045 n.11 (emphasis added). So long as "no warrant or probable cause and exigent circumstances exist, *the citizen has the right to terminate his voluntary participation in the conversation by retiring into his home and closing the door.*" *Id.* (emphasis added). The existence of exigent circumstances is a mixed question of law and fact. *2025 Emery Hwy., L.L.C. v. Bibb Cnty.*, 377 F. Supp. 2d 1310, 1360 (M.D. Ga. 2005), *aff'd*, 218 F. App'x 869 (11th Cir. 2007).

To adequately analyze whether exigent circumstances existed here, the Court begins with Defendants' initial plan to conduct a "knock-and-talk" investigation, asking first about the payment of rent and then segue into asking about narcotics.[81] Looking at the following events chronologically, it is obvious that Defendants' "knock-and-talk" investigation went sideways virtually from the very beginning.

The Record could support a finding that Defendants violated their authority before they even got to the front door. As noted above, they had the authority—as any usual citizen— to approach the home by the front path. A valid knock-and-talk encounter did not permit Deputy Branham to start such investigation in the Plaintiffs' backyard while his Co-Defendants approached the front door.[82]

Summerlin answered the front door and quickly shut it when one of the officers reached for the door. Defendants contend that Summerlin actually slammed the door and locked it. Even if true, Summerlin's actions in shutting and locking the door to his home, alone, provided no basis in law for the officers to believe they had exigent circumstances to

---

[81] Branham Dep. 25:21–26.

[82] A jury could also infer from the following evidence that Defendants did not go to the Residence intending to conduct a valid knock-and-talk investigation: (1) intentionally parking their vehicles so that someone looking outside could not observe them prior to the Defendants having an opportunity to knock on the door; (2) covering the "Sheriff's" markings on their clothing; and (3) failing to announce themselves as law enforcement to the occupants of the Residence when they knocked on the door.

make forcible entry. Defendants cite no authority to the contrary. During a "knock-and-talk" investigation, an individual is not required to talk to the police and is free to end any conversation. *Moore*, 806 F.3d at 1045 n.11. Whether Summerlin shut the door slowly and politely, quickly, or slammed it in Defendants' faces, alone, is insufficient to establish exigent circumstances. He had the absolute right to do so. He also had the right to lock Defendants out—which apparently was necessary given Sgt. Griffin's efforts to immediately try to pull the door back open, and then later to try to forcibly reopen the door with a shovel. In fact, under the "knock-and-talk" encounter, the Defendants should have taken Plaintiffs' response as a refusal to engage in conversation, at which point Defendants should have left the premises. *Cf. Jardines*, 569 U.S. at 8 ("absent an invitation to linger longer," law enforcement should leave). If Summerlin slammed the door, that was effectively the absence of an invitation to linger longer. To accept Defendants' implication that shutting the door alone is sufficient to establish exigency, would mean that Plaintiffs' right to refuse entry has no value—not a Constitutional right. This is particularly true where, as here, the homeowner, per Plaintiffs, does not even know who is attempting to forcibly gain entry.

Summerlin did not immediately reopen the door after being ordered to do so by the Defendants. Again, Summerlin was not required to do so. Just because Defendants thereafter announced that police were present, without more, did not impose any obligation on Summerlin to reconsider his actions and immediately reopen the door. Defendants neither offer nor present any legal basis showing that Summerlin was required for any reason to reopen the door or that they could then, therefore, make forcible entry. Significantly, even with the door having been previously opened wide enough for Summerlin's entire body to be visible, Defendants do not point to any evidence they observed from the opened doorway such as the smell of marijuana, or of methamphetamine being cooked, or noticing what might have been controlled substances or weapons, which, if they had been observed, might have established exigency. Accepting Defendants' basis on the grounds asserted, would effectively convert every "knock and talk" where a homeowner refuses to engage and shuts his door into exigency. More is needed to overcome factually, as a matter of law, the Constitution's protection and the presumption of unreasonableness associated with invading the sanctity of an individual's home without a warrant or consent. It is important to note that Defendants do

not present circumstances where they were armed with a search or arrest warrant and were there to exercise it. In such circumstances, officers indeed could have demanded entry. Here, however, only probable cause and exigency could authorize their command to Plaintiffs to open the door followed by forced entry if they were refused.

Defendants contend they heard the sound of someone running through the house and away from the door. Contrary to Sgt. Griffin's belief,[83] this adds nothing to Defendants' legal authority to forcibly enter the home after having been refused entry. Even if Defendants heard Summerlin running—which Plaintiffs testified he is unable to do—this is not a circumstance where a person located outside of his home flees from the presence of law enforcement officers already identified as such. Plaintiff, here, remained in the sanctity of his home. As Plaintiffs argue, a "homeowner ending a knock-and-talk by closing the door is not required to freeze in place."[84] Defendants presented no facts or legal basis for the contrary conclusion. Capt. Miller's testimony shows he clearly understood and agreed that none of these events provided probable cause for a search warrant:

> Q.  Was there ever a discussion after Mr. Hoyt shut the front door about simply applying for a search warrant?
>
> A.  No. What[,] we were going to get . . . a search warrant . . . just because he slammed the door in our face?
>
> . . . .
>
> Q.  So[,] but how about this. Even when you heard . . . what you call running and the continued refusal to answer the door, was there any discussion about, look, let's call a magistrate and get a search warrant?
>
> A.  No, I didn't feel like we had, you know, enough evidence for a search warrant.
>
> Q.  Well, I'm talking about after you heard the running?
>
> A.  Yes, there was running.
>
> Q.  Like, so what. Is that right?
>
> A.  I mean, it wasn't – *we didn't directly see him come to the door with a gun in his hand or anything like that or had narcotics in his hand. He just slammed the door and was running.*

---

[83] Although he did not know Summerlin, Sgt. Griffin believed exigent circumstances existed to believe Summerlin was getting rid of evidence or going to get a weapon merely because Summerlin opened the door, saw the Defendants were police—which is not supported by the Record—slammed the door, and then ran to the back of the house. *See supra* text accompanying notes 47–49.

[84] Doc. 45 at 15.

Q. Right. And –

A. We didn't have an arrest warrant for his person, so –

Q. So the reason – I mean, you're telling me that there was no discussion about maybe pausing things and getting a search warrant because you knew that you didn't have enough to get a search warrant. Is that right?

A. No, that's why we were doing a knock and talk, because –

Q. Do you understand my question?

A. Yes. No, there wasn't – *I didn't feel like there was enough to apply for a search warrant at that point.*[85]

Rather than leaving the Residence, Sgt. Griffin and Deputy Crosby left the front door area and ran over to look through a window. "When the Government obtains information by physically intruding on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." *Jardines*, 569 U.S. at 5 (2013) (citation and internal quotation marks omitted). Not all areas of private property are protected.

> But when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; *the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window.*

*Id.* at 6 (emphasis added) (citation omitted). When Summerlin opened the door, no one saw him with a gun or other weapon and no one saw any drugs or other illegal activity. Defendants had nothing more of factual value to satisfy probable cause for a search warrant than they did at the start of the attempted "knock-and-talk" encounter. And the Record here could support a finding that they did not have exigent circumstances. To the extent Deputy Branham's positioning himself in the back yard did not invalidate their knock-and-talk investigation, which is as an initial matter inconsistent with the stated allowed scope of such investigation, any appearance of validity ceased when Sgt. Griffin and Deputy Crosby left the front door to go to a window and peer inside Plaintiffs' Residence. They again, if such facts are proved at trial, exceeded activities that any citizen might lawfully do on the premises of another—*i.e.*, a

---

[85] Miller Dep. 43:22–45:5 (emphasis added).

citizen may not enter upon the lands of another and proceed to peer into the windows to check out what can be seen. *Id.*

Defendants argue that they had probable cause and exigent circumstances to enter the Residence because *after* moving to the window they saw Summerlin run (or even walk quickly) through Shaw's bedroom and enter a bathroom with something in a "clutched fist," after which they heard a toilet flush.[86] Defendants contend they reasonably believed Summerlin was destroying evidence of the drugs. This thin reed on which Defendants hang their arguments is as a matter of law too weak to conclusively withstand the assertion of Plaintiffs' Fourth Amendment rights. Not only were Defendants not in a lawful position when they observed Summerlin go into the bathroom and heard the toilet flush, but they still had nothing more than unsupported suspicions that there may have been drugs in the Residence or that Summerlin may have been involved in the cooking and selling of methamphetamine. Most importantly, Defendants had intruded into space on the property protected by the Fourth Amendment to make the observation they now seek to use to establish exigent circumstances. *See Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("A Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.").

The Defendants assert "[a]n exigency exists if 'the facts . . . would lead a reasonable, experienced agent to believe that evidence *might* be destroyed before a warrant could be secured.'" (Doc. 39-1 at 8 (quoting *Tobin*, 923 F.2d at 1510 (emphasis added by Defendants))). While this might be an accurate statement of the law as to one potential exigent circumstance, the facts in *Tobin* are substantially different than those in this case. In *Tobin*, Drug Enforcement Administration agents personally observed Tobin abruptly stop his vehicle in front of a house, back into the driveway, exit the vehicle, look around, run to the front door, knock, and quickly enter the house. Another person, Ackerson, then partially opened the garage door and looked up and down the street before Tobin emerged from the garage, unlocked his vehicle trunk, removed three tubular clear plastic bags approximately four feet in length with smaller bundles visible inside the larger bags, and then quickly put the bags in the garage. *Tobin*, 923 F.2d at

---

[86] *Id.* 38:13–19; *but see*, Griffin 2024 Dep. 83:22–23 (Griffin suspected Summerlin was going to flush drugs down the toilet, but he "just never heard the commode flush.").

1508. The agents believed the tubular bags contained cocaine and decided to go to the door and talk to the occupants of the house. *Id.* The agents knocked, identified themselves as law enforcement, and stated they wanted to talk to the occupants. *Id.* at 1508 n.1. Ackerson eventually opened the door at which time the agents smelled marijuana coming from inside the house. *Id.* at 1508. In *Tobin*, the Eleventh Circuit found that based on their surveillance, the agents had probable cause to believe that narcotics were in the garage or the house. *Id.* at 1510–11. To the extent the agents did not also have exigent circumstances to permit a warrantless search, once Ackerson opened the door and the agents smelled the marijuana, they also had reason to believe that evidence might be destroyed before a warrant could be secured. *Id.* at 1511–12. *See also Walker*, 390 F. App'x at 856 (probable cause established by law enforcement officers' personal observations of drug activity, and exigent circumstances justified officers' warrantless entry into home using knock and announce procedure to secure evidence where surveillance showed substantial increase in activity at house such that the officers were "watching the evidence walk out of the door" while waiting for another officer to return with warrant).

As discussed above, the Defendants here had nothing more than the stale statements of two witnesses that there was a lot of traffic during varying hours, the noncredible statement of an incarcerated man with a lengthy criminal history involving drugs and no evidence that he personally observed anything, and Defendants' drive-by surveillance that provided no evidence whatsoever of illegal activity prior to conducting their knock-and-talk encounter. Further, also unlike *Tobin*, none of the Defendants saw or smelled any drugs when Summerlin opened the door. Neither did anyone see Summerlin with a gun or other weapon, and no one observed any other illegal activity.

Absent consent, both probable cause and exigent circumstances are required for a warrantless entry. *E.g.*, *Tobin*, 923 F.2d at 1510. Defendants initially admitted in their depositions that they did not believe they had sufficient probable cause to obtain a warrant.[87] Although Defendants now change their position, the Court has found that Plaintiffs pointed to Record evidence creating a genuine issue of material fact as to whether Defendants

---

[87] *See supra* text accompanying notes 76, 85.

established probable cause. And, here the Court finds that Plaintiffs also pointed to Record evidence creating a genuine issue of material fact as to whether there were exigent circumstances in the context of Defendants' "knock-and-talk" encounter. Accordingly, insufficient undisputed material factual evidence exists upon which to conclude as a matter of law that Defendants had probable cause and that exigent circumstances existed to create an exemption from the requirement that Defendants obtain a warrant.

### c.    Unlawful Entry, Search, and Seizure

After Summerlin closed the front door, Defendants escalated their attempts to get into the Residence and further into potentially unlawful territory. They appear to have abandoned their stated original plan and purpose; *i.e.*, a consensual "knock-and-talk." Instead, Defendants demanded entry by first attempting to forcibly pull the door back open, then beating on the window to Shaw's bedroom with the butt of a gun and yelling at her to open the door, next trying to force the door open with a shovel, and ultimately forcing their way in by "bum-rushing" Summerlin when he opened the door the second time. "As the Supreme Court has explained, the Fourth Amendment 'draw[s] a firm line at the entrance to the house.'" *Moore*, 806 F.3d at 1043 (quoting *Payton*, 445 U.S. at 590)). Absent a warrant or probable cause and exigent circumstances, *any physical invasion of the structure of the home, by even a fraction of an inch, [is] too much." Kyllo v. United States*, 533 U.S. 27, 37 (emphasis added) (citation and internal quotation marks omitted).

Defendants did not have a warrant. Nor did they have consent to enter the Residence. "When an officer enters a person's home without a warrant and without consent, any resulting search or seizure violates the Fourth Amendment unless it was supported by probable cause and exigent circumstances." *Hardigree*, 992 F.3d at 1224. Defendants' argument that they had the necessary probable cause and exigent circumstances to enter Plaintiffs' Residence without a warrant or consent has been addressed.

At this juncture, the Court finds that genuine issues of material fact exist, which if presented to and believed by a jury, could result in a finding that Defendants violated Plaintiffs' rights by unlawfully entering Plaintiffs' Residence. And, further, that any actions taken by Defendants inside the Residence; *i.e.*, searching the Residence and seizing Plaintiffs, could

likewise support the findings of violations of Plaintiffs' Constitutional rights. *Hardigree*, 992 F.3d at 1224.

>    2. Plaintiffs offered sufficient evidence to create a genuine issue of material
>       fact as to whether Sgt. Griffin used excessive force in seizing Summerlin

A court must look at the totality of the circumstances in making an assessment as to excessive force. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1302 (11th Cir. 2024). A claim of excessive force "presents a discrete constitutional violation relating to the manner in which an arrest was carried out." *Bashir*, 445 F.3d at 1332. "A genuine 'excessive force' claim relates to the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). An excessive force claim predicated *solely* on allegations that the arresting officer lacked authority to make an arrest is entirely derivative of, and is subsumed within, the unlawful arrest claim, and such a claim is therefore subject to dismissal. *Derowitsch v. Granger*, 783 F. App'x 979, 984 (11th Cir. 2019) (per curiam). *Compare Andrews v. Scott*, 729 F. App'x 804, 811 (11th Cir. 2018) (per curiam) (genuine claim—district court did not err in denying motion to dismiss excessive force claim where officers lacked probable cause for arrest, but plaintiff's excessive force claim was based on officer aggressively pulling plaintiff out of a vehicle, forcefully turning her around, slamming her against the car door, and cuffing her hands behind her back) *with Derowitsch*, 783 F. App'x at 984 (derivative claim—dismissing excessive force claims based solely on allegations that defendants lacked probable cause or arguable probable cause to arrest plaintiffs and only other basis for claim was the defendants placed plaintiffs in handcuffs and pointed their guns at one of the plaintiffs).

Here, Summerlin's excessive force claim is not based *solely* on the same set of facts which support Plaintiffs' § 1983 claims for unlawful search and seizure and unlawful entry stated in Count I of their Complaint. Those claims are based on Defendants' actions that occurred up to the point Defendants pushed through the front door to keep Summerlin from closing it on them again. Summerlin's excessive force claim—as stated in Count II—rests on

Sgt. Griffin's alleged actions as he entered the house, bum-rushed Summerlin, knocked him off his feet, and slammed Summerlin's head on the coffee table.[88]

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Durruthy v. Pastor*, 351 F.3d 1080, 1093 (11th Cir. 2003) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)). As with most Fourth Amendment inquiries, the inquiry turns on reasonableness. *Graham v. Connor*, 490 U.S. 386, 395–96 (1989). The Court must ask "whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." *Edwards v. Shanley*, 666 F.3d 1289, 1295 (11th Cir. 2012).

> Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham*, 490 U.S. at 396. The "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Post v. Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting *Graham*, 490 U.S. at 394). More recently, the Supreme Court stated: "To assess whether an officer acted reasonably in using force, a court *must* consider all the relevant circumstances, including facts and events leading up to the climactic moment." *Barnes v. Felix*, 605 U.S. ___, 145 S. Ct. 1353, 1356 (2025) (emphasis added).

When confronted with an excessive force claim, it is important to note that not every use of force violates the Fourth Amendment. Rather, "[the Supreme Court's] Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. The Eleventh Circuit also recognizes that a

---

[88] Defendants contend that "plaintiffs acknowledge that 'if an excessive force claim is 'entirely derivative of' a false arrest claim, it fails as a matter of law.'" (Doc. 57 at 6 (quoting Doc. 45 at 20 n.12)). While Defendants' statement is true, Plaintiffs did not concede, as Defendants infer, that Summerlin's excessive force claim is derivative of a false arrest claim. Plaintiffs' excessive force argument includes a lack of probable cause component, but that is not the *sole* basis for the excessive force claim. Plaintiffs also assert that Griffin slammed Summerlin's head on the coffee table. *See* Doc. 1 ¶ 28; Doc. 45 at 21.

Fourth Amendment violation requires more than the use of *de minimis* force. *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000). "For even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls." *Brown v. City of Huntsville*, 608 F.3d 724, 740 (11th Cir. 2010). Of course, each of these presume a valid warrant or valid investigatory stop. Defendants do not contend they possessed a valid warrant. Nor do they contend they conducted an investigatory stop.

Plaintiffs claim Sgt. Griffin used an excessive amount of force against Summerlin because Summerlin did not resist and posed no threat. Summerlin contends that no force was necessary, let alone slamming his head on the coffee table. He further contends that Sgt. Griffin acted maliciously and sadistically, causing Summerlin substantial physical injuries for which Summerlin is entitled to compensatory and punitive damages. Plaintiffs concede that Summerlin did not receive any medical treatment as a result of the April 13, 2021 incident.[89] Further, the only pain Summerlin noticed afterwards was stiffness in his neck, and that headaches he experienced in the days following the incident were worse than normal.[90]

Defendants analyze the *Graham* factors on the theory that they had established probable cause and an exigency justifying entry into Plaintiffs' Residence because of the possibility that Summerlin was going for a weapon and flushing evidence down the toilet. However, Defendants' assertions are greatly affected by the findings of fact regarding Plaintiffs' Fourth Amendment claims already discussed above, and those findings make summary judgment as to Summerlin's excessive force claim inappropriate at this stage of the proceedings. *Hardigree*, 992 F.3d 1216, 1221-22 (heavily disputed facts regarding defendant's lawful entry result in genuine issues of material fact making summary judgment improper as to unlawful entry claim, remaining claims "colored" by disputed facts, as well as defendant's qualified and official immunity defenses). Additionally, if Plaintiffs prevail on their claim of unlawful entry, there would be no basis for the use of any force resulting from that entry.

Further, there is a genuine dispute of material fact as to whether Sgt. Griffin touched Summerlin. If the facts presented by Plaintiffs are believed by the trier of fact, they could

---

[89] Doc. 45-1 ¶ 42.

[90] *Id.* ¶ 43.

support a finding that Sgt. Griffin used excessive force against Summerlin in violation of Summerlin's Fourth Amendment rights.

### 3. At the time of the April 13, 2021 incident, the law was clearly established as to Defendants' unlawful entry into Plaintiffs' Residence, unlawful search, and unlawful seizure of Summerlin

The final question as to whether Defendants are entitled to qualified immunity is whether Defendants' conduct if proved violated clearly established law. In the Eleventh Circuit, a constitutional right is clearly established for qualified immunity purposes when it is, "sufficiently clear that every reasonable official would have understood what he is doing violates that right." *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1273 (11th Cir. 2021) (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). Typically, a plaintiff can show that a constitutional violation was clearly established by pointing to a case in existence at the time in which the Eleventh Circuit or the United States Supreme Court found a violation based on materially similar facts. *Johnson*, 18 F.4th at 1274. The plaintiff does not need to show that a case has determined that the officer's conduct specifically has been held unlawful, but only that the unlawfulness of the conduct was apparent in light of existing law. "Thus, the salient question for [the Court's] clearly established analysis is whether the . . . law at the time the officers acted gave them fair warning that their conduct was unconstitutional." *Bates*, 518 F.3d at 1248 (internal quotation marks omitted).

> A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Although "this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."

*Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5–6 (2021) (per curiam) (citations omitted), *quoted in*, *Benning v. Comm'r, Georgia Dep't of Corr.*, 71 F.4th 1324, 1333 (11th Cir. 2023), *cert. denied sub nom. Benning v. Oliver*, 144 S. Ct. 1457 (2024).

At the time Defendants entered Plaintiffs' Residence, "it was . . . clearly established law that, absent [consent or] probable cause and exigent circumstances, a warrantless search of a residence violates the Fourth Amendment, unless the officers engage in reasonable efforts to

avoid error." *Hartsfield v. Lemacks*, 50 F.3d 950, 955 (11th Cir. 1995), *as amended* (June 14, 1995) (per curiam) (alteration adopted); *Payton,* 445 U.S. at 585–86.

Defendants contend that Plaintiffs have "pointed to no specific case law clearly establishing that it violates the Constitution for offices [sic] to enter a home without a warrant when they have information from multiple sources that drug activity is afoot at the home and the occupant rushes to flush the toilet in response to a knock-and-talk."[91] This argument assumes Defendants are entitled to summary judgment on their probable cause and exigent circumstances arguments. But, the Court has found that insufficient evidence exists in this Record upon which to conclude as a matter of law that Defendants had probable cause and exigent circumstances justifying their entry into Plaintiffs' Residence without a warrant or consent.

As found above, genuine issues of material fact as to probable cause and exigent circumstances exist on this Record. Every reasonable official at the time the events occurred as alleged by Plaintiffs would have understood that, absent probable cause and exigent circumstances, entering Plaintiffs' Residence without a warrant or consent would violate Plaintiffs' Constitutional rights. Accordingly, the Court finds that the law was clearly established at the time Defendants entered Plaintiffs' Residence, and Defendants are not entitled to qualified immunity upon their Motion.

### C.    Conclusions as to § 1983 claims.

Based on the foregoing, the Defendants are not entitled to summary judgment as to Plaintiffs' § 1983 claim for unreasonable search and seizure in violation of the Fourth Amendment against all Defendants. Sgt. Griffin is not entitled to summary judgment as to Summerlin's § 1983 claim for unreasonable and excessive force in violation of the Fourth Amendment against Sgt. Griffin. Defendants are not entitled to summary judgment as to their qualified immunity defense to Plaintiffs' § 1983 claims.

---

[91] Doc. 57 at 8.

## V.    PLAINTIFFS' STATE LAW CLAIMS

### A.  Summerlin's State Law Claim against Sgt. Griffin for Battery

Plaintiffs agreed to the dismissal of their state law claims against Defendants for false imprisonment and for trespass. Thus, the only remaining state law claim is Summerlin's claim for battery against Sgt. Griffin. Summerlin brought this claim under O.C.G.A. § 51-1-13 which provides: "A physical injury done to another shall give a right of action to the injured party, whatever may be the intention of the person causing the injury, unless he is justified under some rule of law. However, intention shall be considered in the assessment of damages." As to Summerlin's battery claim, Plaintiffs argue that because Summerlin delayed reopening the front door, Sgt. Griffin became angry, forced his way into Plaintiffs' home, threw Summerlin into the coffee table, and held a gun to the back of Summerlin's neck. The Georgia Court of Appeals has held that "the intent to cause actual physical harm to another is not absolutely essential to the viability of a civil action for battery. In the interest of one's right of inviolability of one's person, *any unlawful touching is a physical injury to the person and is actionable.*" *Hendricks v. S. Bell Tel. & Tel. Co.*, 387 S.E.2d 593, 594 (1989) (emphasis added) (citing cases).

Sgt. Griffin contends that Summerlin's battery claim is barred by the doctrines of justification and official immunity. Sgt. Griffin asserts that because Defendants were entitled to enter and secure the premises, they were justified in using force to do so. (*See* Doc. 39-1 at 16 (citing O.C.G.A. § 51-11-1 ("If the defendant in a tort action was authorized to do the act complained of, he may plead such authorization as justification."))). This argument, however, presupposes that Defendants' entry into the Residence was in fact lawful. Once again, Defendants' assertion is greatly affected by the findings of fact regarding Plaintiffs' Fourth Amendment claims discussed above, and as a result, summary judgment as to Summerlin's claim against Sgt. Griffin for battery is inappropriate at this stage of the proceeding.

With respect to Sgt. Griffin's contention that he is entitled to official immunity, "Georgia law protects an officer from personal liability arising from his performance of 'official functions' as long as the officer did not act with 'actual malice' or 'actual intent to cause injury.'" *Gates*, 884 F.3d at 1304 (citing GA. CONST. art. I, § 2, para. IX(d)).

> The Georgia Supreme Court has defined actual malice in this context to mean a "deliberate intention to do wrong." As such, actual malice is not established merely by showing that the defendant acted with "ill will." Nor does actual

> malice encompass merely "the reckless disregard for the rights and safety of others." Likewise, the phrase "actual intent to cause injury"—as used in Georgia's official immunity provision—means "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury."

*Id.* (citations omitted). Official immunity applies to an officer's discretionary actions taken within the scope of his official authority. *Id.* For purposes of official immunity, "a discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Marshall v. Browning*, 712 S.E.2d 71, 74 (Ga. Ct. App. 2011). In considering whether an officer acted with malice so as to preclude official immunity, the Georgia Court of Appeals has stated that "[a] fact finder may infer from evidence that a defendant acted with actual malice." *Lagroon v. Lawson*, 759 S.E.2d 878, 883 (Ga. Ct. App. 2014); *see also Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016) (citing *Lagroon*, 759 S.E.2d at 883 and stating "a jury can infer actual malice based on an officer's conduct").

Plaintiffs do not contest, and the Court has already determined, that the Defendants were acting within their discretionary authority with respect to the April 13, 2021 incident. Thus, the question is whether Plaintiffs offered sufficient evidence to create a genuine issue of material fact as to whether Sgt. Griffin acted with actual malice or the actual intent to injure Summerlin. Plaintiffs argue that malice is shown by the way Sgt. Griffin angrily forced his way into Plaintiffs' home, threw Summerlin into the coffee table, and held a gun to the back of Summerlin's neck. Given those actions, along with the evidence of Sgt. Griffin banging on the window with the butt of his gun, shouting "bitch," "open the damn door" at Shaw,[92] and refusing to allow Shaw to go to the bathroom, telling her "[g]o ahead and piss on yourself, bitch[,]"[93] are statements and actions from which, if proved and believed, a jury could infer actual malice on Sgt. Griffin's part.

The Court finds that Plaintiffs have pointed to Record evidence and the Record shows that a genuine dispute of material fact exists which if proved as alleged by Plaintiffs and believed by a jury, could result in a finding that Sgt. Griffin maliciously committed a battery

---

[92] Doc. 57-1 ¶¶ 20–21.

[93] *Id.* ¶¶ 32.

against Summerlin. Accordingly, Sgt. Griffin is not entitled to official immunity upon his Motion.

### B. Punitive Damage and Attorneys' Fee Claims

Defendants contend that because all of Plaintiffs' substantive claims are subject to summary judgment, Plaintiffs' derivative claims for punitive damages and attorneys' fees should be dismissed. Defendants offered no other arguments to support their Motion with respect to these claims. As noted above, the Defendants are not entitled to summary judgment as to Plaintiffs' § 1983 claims or as to Summerlin's battery claim. Thus, Defendants are not entitled to summary judgment as to Plaintiffs' derivative claims for punitive damages and attorneys' fees on the ground asserted by Defendants.

## VI. CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment (Doc. 39) is **GRANTED IN PART** and **DENIED IN PART**.

The Motion is **GRANTED** with respect to Plaintiffs' claims for False Imprisonment in violation of O.C.G.A. § 51-7-20 against all Defendants (Count 3) and Trespass in violation of O.C.G.A. § 51-9-1 against all Defendants (Count 5), and those claims are **DISMISSED WITH PREJUDICE**.

The Motion is **DENIED** with respect to all Defendants' assertions of qualified immunity and Sgt. Griffin's assertion of official immunity.

The Motion is **DENIED** with respect to Plaintiffs' remaining claims, which in effect leaves the following claims pending in this case:

Count 1: § 1983 Claim for Unreasonable Search and Seizure in violation of the Fourth Amendment against all Defendants;

Count 2: § 1983 Claim for Unreasonable and Excessive Force in violation of the Fourth Amendment against Defendant Griffin;

Count 4: Battery in violation of O.C.G.A. § 51-1-13 against Defendant Griffin;

Count 6: Punitive Damages under O.C.G.A. § 51-12-5.1 against all Defendants; and

Count 7: Attorney Fees under O.C.G.A. § 13-6-11 against all Defendants.

This case is set for trial during the Court's November 2025 Valdosta Trial Term beginning November 3, 2025. A notice and order to prepare and submit a proposed pretrial order will be issued by separate order.

**SO ORDERED**, this 30th day of September 2025.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**